COURT OF APPEALS
DECISION
DATED AND FILED

July 6, 2023

Samuel A. Christensen
Clerk of Court of Appeals

**NOTICE**

This opinion is subject to further editing. If published, the official version will appear in the bound volume of the Official Reports.

A party may file with the Supreme Court a petition to review an adverse decision by the Court of Appeals. *See* WIS. STAT. § 808.10 and RULE 809.62.

Appeal No. **2021AP1768**

STATE OF WISCONSIN

Cir. Ct. No. 2020CV274

IN COURT OF APPEALS
DISTRICT III

---

ROGER L. THOMPSON AND SHEILA R. THOMPSON,

PLAINTIFFS-RESPONDENTS,

V.

ROBERT POPPLE AND MARY POPPLE,

DEFENDANTS-APPELLANTS.

---

APPEAL from an order of the circuit court for Chippewa County: JAMES M. ISAACSON, Judge. *Affirmed.*

Before Stark, P.J., Hruz and Gill, JJ.

¶1 GILL, J. In 2020, Robert and Mary Popple sought to exercise a first option to buy (hereinafter, "option") on a portion of a parcel from Roger and Sheila Thompson pursuant to the terms of a 1993 warranty deed setting the purchase price at "the cost of the improvements" to the lot plus acquisition costs.

Robert and Mary[1] appeal a circuit court order setting the amount they must pay to exercise the option at $33,000. They contend that the court erred, as a matter of law, by not setting the amount due to exercise the option at the 1993 cost of improvements to the lot, rather than at the current value of those costs. Specifically, they claim the court erred because the option was unambiguous and, as a matter of contract interpretation, the court should not have applied equitable principles in setting the value of the option. We disagree and affirm the court's order.

## BACKGROUND

¶2 Robert and Mary own a parcel of property on a lake in Chippewa Falls. Melvin Popple, a cousin of Robert, owned a parcel of property adjacent to Robert and Mary's property. Because of issues with county zoning ordinances, particularly lot size requirements, Melvin could not build a desired garage on his property.

¶3 To provide Melvin the space needed to build the garage, Robert and Mary "gifted" a portion of their property (hereinafter, "garage lot") to Melvin in 1993. They transferred the garage lot to Melvin via a warranty deed, which included an option to buy the garage lot:

> [Melvin] agrees that if [the garage lot] is ever sold or when [Melvin] dies, [Robert and Mary] will be given the first option to buy the [garage lot] at an amount equal to the cost of the improvements plus acquisition costs.

---

[1] Because some of the relevant individuals in this case share the same last name, we will refer to those individuals by their first names throughout the remainder of the opinion.

The warranty deed was not signed by Melvin, although this fact was not expressly brought to the attention of the circuit court.[2]

¶4      The combined properties—Melvin's original property plus the garage lot—became a single parcel, making Melvin's property "'less' non[]conforming and … in compliance with the zoning regulations."[3]  Melvin constructed a garage on the garage lot portion of his property later in 1993 at a cost of $9,265.

---

[2] Normally, as the grantee in this situation, Melvin would not have been required to sign the warranty deed under the statute of frauds.  *See* WIS. STAT. § 706.02(1)(d) (2021-22).  However, because the warranty deed contained an option to buy, the Thompsons argue that Melvin's signature was required.  *See* § 706.02(1)(e) (2021-22).  Robert and Mary do not contest this assertion, and we therefore assume without deciding that Melvin's signature was required under § 706.02(1)(e).

All references to the Wisconsin Statutes are to the 2021-22 version unless otherwise noted.

[3] The record is somewhat unclear in this regard.  What is clear is that there are two relevant county zoning ordinances: a "shoreland district" ordinance requiring a 20,000 square foot lot with certain width requirements, and an "agricultural district" ordinance requiring a 65,340 square foot lot with certain width requirements.  Without the garage lot, Melvin's property was roughly 12,000 square feet.  The garage lot, by itself, is approximately 15,000 square feet.  According to an exhibit attached to Robert and Mary's answer, in 1993 "the transfer of land between adjoining land owners would have been allowed without the need of a survey on the parcel to be transferred, as long as a separate lot of record was not created and any zoning regulations would still need to be adhered to."  The record reflects that the transfer of the garage lot from Robert and Mary to Melvin made Melvin's property "'less' non[]conforming and … in compliance with the zoning regulations."  It is unclear how Melvin's property was in compliance with county zoning ordinances after the transfer of the garage lot given that the entire property was still nonconforming.  That said, the reason for the 1993 transfer being in compliance with the county zoning ordinances is not relevant to our analysis.

Furthermore, and as explained later, the issue with transferring the garage lot back to Robert and Mary appears to lie in the fact that doing so would make the Thompsons' property nonconforming with the shoreland district ordinance and "more non[]conforming" with the agricultural district ordinance.  This is in contrast to the transfer "creat[ing] a non[]conforming lot" as Robert and Mary state on appeal.  The reason for the transfer resulting in issues to the Thompsons' property *is* relevant to our analysis and we will rely on the "more non[]conforming" language used in the record.

¶5      In 2017, Melvin signed a Designation of Transfer on Death of Beneficiary (TOD) for his property, including the garage lot, providing for the transfer of his property to Roger and Sheila Thompson upon his death.  The TOD was signed by Melvin and recorded with the Chippewa County Register of Deeds. Melvin died in 2020, and his property transferred to the Thompsons.

¶6      Following Melvin's death, Robert and Mary were made aware that if they wanted to exercise the option, they would need to file "an application for a variance with the Chippewa County Department of Planning & Zoning" and the Board of Adjustment (collectively, "department").  According to the department, if Robert and Mary exercised the option, Melvin's former property—now the Thompsons' property—would "make the parcel more non[]conforming." Subsequently, Robert and Mary filed a variance application with the department. According to Robert and Mary, the Thompsons stated that they would not support the variance application unless Robert and Mary "paid more than the amount indicated on the [warranty deed]."  The department thereafter "stayed" a decision on the variance application pending a judicial determination regarding the validity of the warranty deed.[4]

---

[4] In the circuit court, the parties disputed the reason for the department staying its decision on the variance application.  The Thompsons argued that the department "sent it back to [the court] to decide whether or not [the warranty deed] should be allowed."  Conversely, Robert and Mary argued that the department stayed its decision "to figure out what the value is for [the garage lot], as far as what the cost of improvement means and how it was to be determined."  The court determined that the department stayed the decision only to permit the court to determine the enforceability of the warranty deed.  The record before us lacks any documentation from the department regarding the reason for the stay.  We therefore assume that the court's decision in this regard was correct.  *See Fiumefreddo v. McLean*, 174 Wis. 2d 10, 27, 496 N.W.2d 226 (Ct. App. 1993).

¶7    In response, the Thompsons filed a suit for declaratory judgment, asking the circuit court to deny the division of the property because the garage lot could not legally be separated from the remainder of their lot per the county zoning ordinances.    Robert and Mary responded by filing an answer and counterclaim, also seeking a declaratory judgment, asking, among other things, that the court enforce the option and that the option value be $9,265, the amount that Melvin paid in 1993 to build the garage, plus "acquisition costs being the attorney fees to draft the necessary paperwork and filing costs."

¶8    Following Robert and Mary's answer and counterclaim, the Thompsons filed a motion for summary judgment, and Robert and Mary filed a "brief for declaratory judgment."  The circuit court held a hearing in May 2021, at which it denied the Thompsons' motion for summary judgment and concluded that the warranty deed was valid and binding on the parties.  The court reasoned:

> [Robert and Mary] want to explain what the intent was.  I don't think that I can impute, from what I have before me, what the intent was, but certainly I got to make a decision based on what was done.
>
>  ….
>
> I'm not inclined to void the language of the deed.  The deed was recorded properly.  Again, Melvin died, and before he died, he didn't—didn't see fit to try to clear up that option or that option language.  It was on the contract when the parties before me today had their property.
>
>  ….
>
> But at this point, the short answer is the deed is clear.  I think it's straight forward.  The option was there.  Again, I don't think anybody expected this to happen down the road … but here we are.

¶9    The circuit court reserved ruling on the value Robert and Mary must pay to exercise the option, but it invited the parties to return to court "if there's no

satisfactory response" from the department.  The court did make some comments about its possible decision regarding what Robert and Mary would have to pay to exercise the option, stating:

> What I have trouble with, folks, is the option—the price. You [are] trying to impute 28 years after the fact what a fair value for improvement is.  And the [c]ourt believes that it is not necessarily just what the cost was back in 1993.
>
> ….
>
> And I'll just observe that I don't think the proper measure of option price is the 9[,]300 bucks.
>
> ….
>
> I can't be putting 2021 dollars into a '93 plan.  I think that's not equitable.  And in the end, real estate transfers and stuff, to some extent, have to be equitable.

¶10     The circuit court considered the issue of how much Robert and Mary must pay to exercise the option at a hearing in July 2021.[5]  Robert and Mary argued that the court should interpret the warranty deed like it would any contract. That is, they argued that the court should consider what is "within the four corners of the document" and conclude that the deed unambiguously set the value of the "cost of the improvements" at $9,265, the price paid to build the garage in 1993.

---

[5] Although the circuit court made its oral decision in July 2021, the court did not sign the official order until September 2021.  For ease of reading, we refer to the court's July 2021 decision as its decision, despite the fact that the order was not signed until that September.

¶11     The circuit court determined that Robert and Mary would be required to pay $33,000 to exercise the option,[6] explaining:

> The damages, I think, still demand the [c]ourt do equity in the parties' treatment of this matter. So the issue comes down to what I think is properly defined as "value of the improvement" going forward.
>
> I advised counsel that I was not content to use a building cost from over—from almost 30 years ago, and that the best evidence I had today was an estimate from Bauman Construction indicating it was going to cost about $33,000 to build that building.
>
>  ….
>
> So it was my belief that this [c]ourt, I think having to do equity as well as make decisions on other matters, would set a value on that improvement at $33,000. That's the only evidence I have, and that's my decision.
>
>  ….
>
> To do otherwise, in my opinion, would provide a windfall, and I think that's inappropriate.

¶12     Robert and Mary appeal. Additional facts will provided below as necessary.

---

[6] The circuit court ordered that, "should [Robert and Mary] elect to invoke [the option], the value is $33,000.00 to be paid to the Thompsons." We interpret the court's order as setting the total value of the option at $33,000, including "the cost of the improvements" "plus acquisition costs." We will therefore refer to the court's valuation as the "value of the option," although the dispute centers on the specific "cost of the improvements" and not the "acquisition costs."

## DISCUSSION

¶13    The only issue before this court is whether the circuit court erred by concluding that Robert and Mary are required to pay $33,000 upon exercising the option.

¶14    As an initial matter, the parties disagree over the applicable standard of review that we should apply on appeal. Robert and Mary argue that the circuit court's May 2021 decision was grounded in contract law, and that the court therefore erred by applying equitable principles to determine the value of the option. Accordingly, Robert and Mary urge this court to engage in a de novo standard of review to the court's July 2021 decision and determine the "unambiguous" value of the option by applying canons of contract interpretation to undisputed facts. *See Gilbert v. Geiger*, 2008 WI App 29, ¶10, 307 Wis. 2d 463, 747 N.W.2d 188. Conversely, the Thompsons contend that we must review the court's July 2021 decision for an erroneous exercise of discretion because both parties requested declaratory judgment and because the warranty deed is "legally defective," thus invoking the court's equitable powers under WIS. STAT. § 706.04 to enforce the warranty deed.[7]

---

[7] The Thompsons also argue that we should affirm the circuit court's July 2021 decision for other reasons, including because the option is extinguished and because the warranty deed is ambiguous. Under either theory of affirmation, the Thompsons contend that the warranty deed is still enforceable in equity. As alluded to previously, Robert and Mary also urge us to consider whether the warranty deed is ambiguous.

(continued)

¶15    For the reasons articulated below, we agree with the Thompsons that we must review the circuit court's decision regarding the value of the option for an erroneous exercise of discretion. *See* ***Prezioso v. Aerts***, 2014 WI App 126, ¶19, 358 Wis. 2d 714, 858 N.W.2d 386 ("Whether an equitable doctrine can be applied in a particular case is … a question of law that we review independently."). Under this standard, we conclude the court did not erroneously exercise its discretion by determining that Robert and Mary are required to pay $33,000 to exercise the option, but we do so for different reasons than those expressly articulated by the court. *See* ***Haessly v. Germantown Mut. Ins. Co.***, 213 Wis. 2d 108, 116-17, 569 N.W.2d 804 (Ct. App. 1997).

¶16    To begin, Robert and Mary sought a declaratory judgment to enforce the option and establish its value. "The grant or denial of a declaratory judgment is addressed to [a] circuit court's discretion. However, when the exercise of such discretion turns upon a question of law, we review the question independently of [a] court's determination." ***Olson v. Farrar***, 2012 WI 3, ¶24, 338 Wis. 2d 215, 809 N.W.2d 1. Application of an unambiguous deed presents a question of law. ***Gilbert***, 307 Wis. 2d 463, ¶10.

¶17    Here, the warranty deed was not signed by Melvin. It is therefore legally deficient under the statute of frauds. The statute of frauds dictates that

---

Because we conclude that the circuit court did not err by applying equitable principles in determining the value of the option, we will not address whether the deed is ambiguous. *See* ***Zapuchlak v. Hucal***, 82 Wis. 2d 184, 191, 262 N.W.2d 514 (1978) (in the context of an insufficient land description under the statute of frauds, the "[f]ailure to comply with the statute renders the contract void. The question in such a case is not what reasonable [persons] intended to convey, or what the parties know …." (citation omitted)). Further, because we affirm the court's equitable decision, we need not address the Thompsons' "extinguished option" argument. *See* ***Maryland Arms Ltd. P'ship v. Connell***, 2010 WI 64, ¶48, 326 Wis. 2d 300, 786 N.W.2d 15 ("Typically, an appellate court should decide cases on the narrowest possible grounds.").

transactions "by which any interest in land is created, aliened, mortgaged, assigned or may be otherwise affected in law or in equity" are invalid "unless evidenced by a conveyance that," in relevant part, "[i]s signed by or on behalf of all parties, if a lease or contract to convey." WIS. STAT. §§ 706.001(1) and 706.02(1)(e).

¶18    Nevertheless, under the statute of frauds, "[a] transaction which does not satisfy one or more of the requirements of [WIS. STAT. §] 706.02 may be enforceable *in whole or in part under doctrines of equity*." WIS. STAT. § 706.04 (emphasis added). For § 706.04 to apply, "all of the elements of the transaction" must be "clearly and satisfactorily proved," and, as relevant here, "[t]he deficiency of the conveyance may be supplied by reformation in equity." Sec. 706.04(1); *see also **Security Pac. Nat'l Bank v. Ginkowski***, 140 Wis. 2d 332, 335-38, 410 N.W.2d 589 (Ct. App. 1987) (stating that § 706.04(1) applies to, e.g., a mutual mistake).

¶19    Robert and Mary ask this court to enforce the unsigned contract— without relying on equitable principles—and then to apply a de novo contractual interpretation to the contract's terms. This we cannot do. *See **Spensley Feeds, Inc. v. Livingston Feed & Lumber, Inc.***, 128 Wis. 2d 279, 286-87, 381 N.W.2d 601 (Ct. App. 1985) (land transaction which did not satisfy the statute of frauds was unenforceable "unless it [met] the equitable alternatives set forth in [WIS. STAT. §] 706.04"). As we explained above, it is undisputed that Melvin did not sign the warranty deed, which is a prerequisite under WIS. STAT. § 706.02(1)(e) because it contained an option to buy. Therefore, equitable means are necessary to enforce the intended contract.

¶20    The circuit court found, in equity, that the warranty deed was enforceable, but the court's reasoning behind that decision is unclear. We agree

that the deed is enforceable in equity. Because WIS. STAT. § 706.04 applies, and because Robert and Mary requested declaratory judgment, we conclude that the court did not err by applying equitable considerations in setting the value of the option.

¶21 Our next step is to determine whether the circuit court appropriately exercised its discretion by finding in equity that Robert and Mary were required to pay $33,000 to exercise the option. "The basis of all equitable rules is the principle of discretionary application." *Wynhoff v. Vogt*, 2000 WI App 57, ¶13, 233 Wis. 2d 673, 608 N.W.2d 400 (citation omitted). "Discretionary acts are upheld if [a] circuit court 'examined the relevant facts, applied a proper standard of law, and, using a demonstrated rational process, reached a conclusion that a reasonable judge could reach.' We will sustain [a] court's findings of fact unless they are clearly erroneous." *Id.* (citation omitted). "[W]e may search the record to determine if it supports [a] court's discretionary decision." *Randall v. Randall*, 2000 WI App 98, ¶7, 235 Wis. 2d 1, 612 N.W.2d 737.

¶22 The warranty deed provided that Robert and Mary were given the first option to buy the garage lot "at an amount equal to the cost of the improvements plus acquisition costs." In determining the amount that Robert and Mary were required to pay to exercise the option, the circuit court considered a receipt evidencing that it cost $9,265 to build the garage in 1993. Additionally, Robert and Mary presented evidence that the cost to construct the garage in 2021 would be significantly higher than the 1993 cost. Specifically, Robert and Mary presented an email from the construction company that built the garage in 1993, estimating the "current cost" to construct a "similar garage with a concrete floor"

11

in 2021 at approximately $33,000. The Thompsons did not file a response to, or present any evidence regarding, this estimate.[8]

¶23     The circuit court then found that it was inequitable for Robert and Mary to pay only the cost incurred to build the garage in 1993 upon exercising the option, stating that "[t]he damages … still demand the [c]ourt do equity in the parties' treatment of this matter."  According to the court, "[t]o do otherwise … would provide a windfall" to Robert and Mary.  Under these facts, we conclude that the court did not erroneously exercise its discretion.

¶24     Notably, the circuit court determined that applying the cost to build the garage in 1993 dollars would not be fair to the Thompsons in determining the value of the option in 2021 dollars.  This decision was also made in the context of the department's determination that, upon transfer of the garage lot back to Robert and Mary, the Thompsons would be left with a "more non[]conforming" lot.  The court, therefore, enforced the option but did so by requiring Robert and Mary to pay the cost of the improvements in 2021 dollars; which the court referenced as "damages" to the Thompsons.

¶25     We interpret the circuit court's reference to "damages" to mean that it was equitably requiring a greater amount of money to be paid for the option than it would have if the transfer of the garage lot back to Robert and Mary would not leave the Thompsons with a "more non[]conforming" lot.  In all, the court used a

---

[8] In the Thompsons' motion for summary judgment earlier in the litigation, they included a 2018 email from the same construction company, stating that the cost to construct the garage in 2018 would have been $20,000.  Robert and Mary did not argue that this amount should be used if the circuit court did not apply the $9,265 value.

demonstrated rational process and made a conclusion that a reasonable judge could reach.

*By the Court.*—Order affirmed.

Not recommended for publication in the official reports.